IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


| | |
|---|---|
| ABRAHAM ALLEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| STATE FARM MUTUAL AUTOMOBILE | ) |
| INSURANCE COMPANY and | ) |
| MICHAEL YOUNT, | ) |
| | ) No. 3:15-cv-0019-HRH |
| Defendants. | ) |
| | ) |

O R D E R

Motion for Summary Judgment

Defendants move for summary judgment on plaintiff's bad faith claims.[1]  In the

alternative, defendants move for partial summary judgment on some of plaintiff's damages

claims.[2]  Defendants' motion is opposed.[3]  Oral argument was not requested and is not

deemed necessary.

---

[1]Docket No. 151.

[2]Docket No. 151.

[3]Docket No. 157.

<u>Facts</u>

Plaintiff is Abraham Allen. Defendants are State Farm Mutual Automobile Insurance Company and Michael Yount.

On October 17, 2012, plaintiff was working for Alaska's Best Water and was driving a vehicle owned and insured by Alaska's Best Water. Plaintiff was rear-ended at the intersection of Abbott Road and 88th Avenue in Anchorage, Alaska. The insurance policy covering the vehicle was issued by State Farm and provided up to $100,000 in Underinsured Motorist (UIM) coverage.

The driver of the vehicle that rear-ended plaintiff was Kris Brandon, who was also insured by State Farm. Brandon was determined to be at fault for the accident. Plaintiff settled his liability claim against Brandon for $100,000, plus interest and attorney's fees. Plaintiff also received $143,817.21 in Worker's Comp benefits for his injuries arising out of the accident.

State Farm was first advised that plaintiff had a potential UIM claim when his attorney called State Farm on October 22, 2013. On October 24, 2013, State Farm acknowledged that it had received plaintiff's claim,[4] and on October 25, 2013, State Farm opened a UIM claim in its system.[5]

---

[4]Letter to Abraham Allen from Nataja Mealing, Exhibit D at 1, Affidavit of Jeff Isaacson, Docket No. 152.

[5]Auto Claim File, Exhibit B at 27, Isaacson Affidavit, Docket No. 152.

On December 26, 2013, plaintiff requested State Farm's consent to settle his liability claim against Brandon for liability policy limits of $100,000.[6]  After performing an asset check on Brandon, on January 6, 2014, State Farm gave its consent for plaintiff to settle with Brandon for available liability limits.[7]

On March 6, 2014, plaintiff advised State Farm that he was still working on his demand package and that he would send it to State Farm by the end of the month.[8]  The settlement demand package was provided on April 21, 2014.[9]  Plaintiff offered to settle his UIM claim for policy limits of $100,000.[10]

State Farm then began to evaluate plaintiff's UIM claim.  Yount was the adjuster assigned to plaintiff's UIM claim.  On April 29, 2014, Yount started attempting to find photos of the vehicles involved in the accident.[11]  Although it did not have any photos of plaintiff's vehicle, Alaska's Best Water told Yount that there was no physical damage to the vehicle and that the only damage was to the fuel pump assembly.[12]  Brandon told Yount that

---

[6]Id. at 26.

[7]Id. at 25.

[8]Id. at 25.

[9]Id. at 25.

[10]Letter from Denali Law Group to Mark N. Bonfield, Exhibit D at 22, Isaacson's Affidavit, Docket No. 152.

[11]Auto Claim File, Exhibit B at 24, Isaacson's Affidavit, Docket No. 152.

[12]Id. at 23.

the damage to her car that showed up in photos was from driving over snow berms and a prior accident.[13]

On April 30, 2014, Yount requested authorization to deny plaintiff's UIM claim for a number of reasons. First, Yount noted that there was no damage to plaintiff's vehicle.[14] Second, Yount noted that all of the damage to Brandon's vehicle was from another accident or other incidents.[15] Third, Yount noted that plaintiff claimed that he was rear-ended at 35 miles per hour, but that damages to the vehicles did not support a 35 mph impact.[16] Yount also noted that although plaintiff claimed he had injured his head, damages to the vehicles did not support sufficient force for him to have struck his head on the interior pillar and there was no evidence that plaintiff remained unconscious for any length of time after the accident.[17] Fourth, Yount noted that plaintiff's claim that the steel rear bumper of his vehicle was pushed/curled up into the vehicle was not supported by what Yount had been told by Alaska's Best Water.[18] Fifth, Yount noted that the main injury claimed was midline disc protrusion to C5-6 but that he "unable to find a mechanism from this loss to cause this

---

[13]Id. at 22.

[14]Id. at 22.

[15]Id. at 22.

[16]Id. at 22.

[17]Id. at 22.

[18]Id. at 22.

injury."[19]  Sixth, Yount noted that the IME doctor who examined plaintiff in connection with his Worker's Comp claim found that the accident was one of the causes of plaintiff's neck injury but that the IME doctor was "under [the] impression" that the accident occurred at 35 mph and that plaintiff lost consciousness,[20] facts which Yount believed were not supported.[21]

On May 12, 2014, Jeff Isaacson, Yount's Team Manager, noted that "there appears to be some causation questions for this loss."[22]  Isaacson noted that the "IME and PA [plaintiff's attorney] indicate that this was a significant impact of over 35 MPH, however V1 photos indicate no damage, and the only damage claimed by the insured ... was for a fuel pump."[23]  Yount was instructed to "[f]ollow up with PA for list of prior medical providers and auths to obtain records.  We will also need to request WC file, and any damage photos and estimates PA has for vehicle damage."[24]

---

[19]Id. at 22.

[20]Dr. Dietrich did the IME on June 13, 2013.  Exhibit A at 1, Reply to Allen's Opposition to Defendants' Motion for Summary Judgment, Docket No. 158.  Dr. Dietrich noted that plaintiff was "hit by a medium-sized sedan, which he estimates was going the speed limit, about 35 mph" and that he "hit[] his head on the door [and h]e thinks he was momentarily unconscious."  Id. at 2.

[21]Auto Claim File, Exhibit B at 22, Isaacson Affidavit, Docket No. 152.

[22]Id. at 20.

[23]Id. at 20.

[24]Id. at 20.

On May 14, 2014, Yount informed plaintiff's attorney that he "currently d[id] not see any mechanism for significant inj." and requested that plaintiff provide any photos he might have of the vehicle he was driving, a copy of his Worker's Comp file, and the past two years of his medical records.[25]

On May 23, 2014, plaintiff's attorney "emailed copies of photographs of damage to the van plaintiff was allegedly driving at the time of the accident."[26]  Again, on May 29, 2014, plaintiff's attorney emailed Yount photographs of the van that plaintiff was allegedly driving at the time of the accident.[27]  Yount avers that "[w]hen I reviewed them, ... the damage to the vehicle bumper did not appear to be from the accident, since the damage was inconsistent with a rear-end accident by a smaller vehicle.  The damage also did not appear severe enough to cause the injuries being claimed by plaintiff."[28]

On June 5, 2014, plaintiff's attorney advised Yount that plaintiff said "he has not been to doctor since year 2000 for kidney stones.  Had a broken arm prior to that.  No PCP prior to MVA."[29]

---

[25]Id. at 19.

[26]Affidavit of Michael Yount at 6, ¶ 17, Docket No. 153.

[27]Id.

[28]Id. at 6-7.

[29]Auto Claim File, Exhibit B at 18, Isaacson Affidavit, Docket No. 152.

Sometime between June 5, 2014 and June 10, 2014, plaintiff's attorney advised State Farm that plaintiff had had a life insurance physical in 2012.[30]  On June 10, 2014, Yount noted that "[a]t this time, evidence does not support the inj being claimed.  Also, DO [plaintiff] does not appear credible as he has claimed LOC and 35mph impact which appears to be false.  At this time, recomm denial of claim on basis that DO has been fully compensated by liability limits of D/W claim."[31]

On July 10, 2014, Yount noted that plaintiff "denies any medical history over the last 14 years except for physical in 2012 (this was found to be false as records indicate inj from a fall 5 days prior to physical in 2012)."[32]  Plaintiff's medical records showed that he had been seen at Mat-Su Regional 5 days before the September 2012 physical.[33]

On August 18, 2014, Yount discussed plaintiff's claim with Isaacson and Isaacson noted that "[g]iven causation questions, and uncertainty of prior medical treatment, with a questionable relatedness of surgery to the accident, we will need an IME."[34]  Yount then discussed plaintiff's claim with a defense attorney (Stacy Walker) who recommended having a biomechanical engineer "determine if any causation for inj and if none then possibly

---

[30]Id. at 17.

[31]Id. at 17.

[32]Id. at 15.

[33]Id. at 15.

[34]Id. at 15.

records review for doctor to look over the Biomechanical Expert review and formulate a medical opinion."[35] Yount discussed the defense attorney's recommendations with Isaacson who advised him to write a letter retaining the defense attorney and then have her retain the biomechanical engineer.[36]

On August 22, 2014, Walker noted that

> the question is causation. There is an IME done by Dr. [Dietrich] wherein he opines that Allen's problem relates to this accident. His treating physician is of a similar mind set. The adjuster has real questions regarding the file because the impact forces were so low and the plaintiff's damages so high. The claimant's neurosurgeon is also of the opinion that this accident caused [plaintiff's] problems. We don't have many pre[-] accident records and so it's hard to say whether his problems relate to a prior problem or if they were caused by the accident.[37]

On September 22, 2014, Walker advised Yount that there had been some delay in getting a report from the biomechanical engineer.[38] She also advised that "proceeding w/ an Examination Under Oath of [plaintiff] would be beneficial to answer some questions and confirm ... if he did/didn't have any pre-existing neck problems before this MVA, as well as

---

[35]Id. at 14-15.

[36]Id. at 15.

[37]Exhibit 2, Opposition to Motion for Summary Judgment, Docket No. 157.

[38]Auto Claim File, Exhibit B at 12, Isaacson Affidavit, Docket No. 152.

some mechanical questions about the MVA and how he was positioned upon impact."[39] Yount's request to do an Examination under Oath was approved on September 22, 2014[40] and scheduled for October 8, 2014.[41] Yount avers that he requested that "Walker confirm causation, the mechanics of the loss, plaintiff's claim of loss of consciousness, plaintiff's past medical history and providers."[42]

At the Examination Under Oath, plaintiff showed State Farm four pictures that plaintiff had of the vehicle that he had been driving on the day of the accident.[43] These pictures "confirmed there is no separate head rest ... and there is a flat piece of metal (a driver wall) directly behind the seat."[44]

After the Examination Under Oath, State Farm determined that it needed to try to get measurements of plaintiff's vehicle in order to compare measurements of the seat height "w/ [plaintiff's] height regarding his claim that his head went backwards and hit the metal cage behind the driver[']s seat."[45]

---

[39]Id.

[40]Id.

[41]Id. at 11.

[42]Yount Affidavit at 9, ¶ 26, Docket No. 153.

[43]Auto Claim File, Exhibit B at 9, Isaacson's Affidavit, Docket No. 152.

[44]Id.

[45]Id. at 8.

On October 14, 2014, State Farm learned that Alaska's Best Water no longer owned the vehicle that plaintiff had been driving.[46] State Farm then began attempting to locate the current owner of the vehicle.[47]

On October 28, 2014, plaintiff filed suit against defendants. Plaintiff asserted a UIM claim as well as bad faith claims against defendants. Although defendants were not served with plaintiff's complaint until January 2015, they were aware that plaintiff had filed suit prior to being served.[48]

On November 21, 2014, Yount noted that Walker had informed him that the "accident reconstruction expert Toby Hayes has confirmed forces are about 5mph if the damg to r/e of V1 is actually related to this MVA."[49] Yount avers that at this point, he "considered that, if the claimed injury were found to be truly related, an expected award of general damages would be estimated at $100,000."[50] Yount and Walker decided that "based on info we have we should deny claim stating DD fully comp'd by underlying liab carrier. Then through discovery we can obtain further docs to see if it changes impressions of claim or not."[51]

---

[46]Id. at 7.

[47]Id. at 5.

[48]Id. at 3.

[49]Id. at 3.

[50]Yount Affidavit at 9, ¶ 28, Docket No. 153.

[51]Auto Claim File, Exhibit B at 3, Isaacson's Affidavit, Docket No. 152.

Yount also noted that "PA has filed bad faith claim and named me in the suit. No concerns w/ this as nothing has been handled in bad faith, simply investigating a claim. DA will work to stay bad faith claim. Explnd I will req TM auth to deny DD's UIM claim and then will f/u to advise if approved."[52]

On December 3, 2014, Yount noted that he was still awaiting approval to deny plaintiff's UIM claim.[53]

On December 4, 2014, State Farm learned that plaintiff had been treated by a chiropractor and attempted to obtain these records.[54]

Yount avers that by this time,

> based on Dr. Hayes' opinions and the other information gathered during our investigation, we evaluated the range of damages for the UIM claim from a low of zero if the claimed neck injury was not caused by the accident to a high of $330,384, before off-sets, if a jury were to accept that the neck injury was caused by the accident.[[55]]

Yount further avers that "[b]ased on the totality of the investigation and the resulting evaluation, State Farm advised Mr. Allen, through counsel, that State Farm believed Mr.

---

[52]Id. at 3.

[53]Id. at 2.

[54]Id. at 2.

[55]Yount Affidavit at 10, ¶ 29, Docket No. 153.

Allen had been fairly compensated for any injuries caused by the October 17, 2017 motor vehicle accident."[56]

Plaintiff's bad faith claims were severed pending outcome of his UIM claim, which he tried to a jury. On September 2, 2016, the jury awarded plaintiff $354,480.23 for damages caused by the October 17, 2012 motor vehicle collision.[57]

Defendants now move for summary judgment on plaintiff's bad faith claims. In the alternative, defendants move for summary judgment on plaintiff's request for punitive damages and summary judgment that plaintiff is not entitled to seek damages based on the stress of the litigation process, emotional distress caused by the motor vehicle accident, and attorney's fees incurred in connection with his UIM claim.

## Discussion

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In deciding a motion for summary judgment, the court views the evidence of the non-movant

---

[56]Id. at 10, ¶ 30.

[57]Docket No. 91.

in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor. Id. at 255. "[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987).

First, defendants move for summary judgment on plaintiff's bad faith claims. "Under Alaska's contract law, 'the covenant of good faith and fair dealing ... is implied in all contracts.'" Lockwood v. Geico General Ins. Co., 323 P.3d 691, 697 (Alaska 2014) (quoting State Farm Mut. Auto. Ins. Co. v. Weiford, 831 P.2d 1264, 1266 (Alaska 1992)). "Although [the Alaska Supreme Court has] declined to define the elements of the tort of bad faith in an insurance contract, [its] precedent makes clear that the element of breach at least requires the insured to show that the insurer's actions were objectively unreasonable under the circumstances." Id. In order to prevail on his bad faith claims, plaintiff will have to show that the decision to deny his UIM claim was "'made without a reasonable basis.'" Id. at 698 (quoting Hillman v. Nationwide Mut. Fire Ins. Co., 855 P.2d 1321, 1324 (Alaska 1993)).

As an initial matter, there is some disagreement as to whether plaintiff's bad faith claims can be based on violations of the Unfair Claim Settlement Practices Act, AS 21.36.125, and its implementing regulations, 3 AAC 26. In his complaint, plaintiff alleges

that such violations are a "breach of the covenant of good faith and fair dealing...."[58] However, there is no private cause of action for violations of AS 21.36.125. O.K. Lumber Co., Inc. v. Providence Washington Ins. Co., 759 P.2d 523, 527 (Alaska 1988). But, plaintiff has also alleged that violations of AS 21.36.125 are _evidence_ of an insurer's breach of the implied covenant of good faith and fair dealing.[59] Violations of AS 21.36.125 and its implementing regulations could be evidence of bad faith.

Defendants argue that plaintiff's bad faith claims are primarily based on allegations that they acted in bad faith because they investigated and evaluated his UIM claim, rather than just paying it. Defendants argue, however, that there was nothing improper about them investigating and evaluating plaintiff's UIM claim because this claim was fairly debatable. "[A]n insurance company may ... challenge claims which are fairly debatable" without acting in bad faith. Hillman, 855 P.2d at 1324 (citation omitted). "[I]f reasonable minds can differ on the coverage-determining facts or law, then [a] claim is fairly debatable." Bellville v. Farm Bureau Mut. Ins. Co., 702 N.W.2d 468, 473 (Iowa 2005). "The fact that the insurer's position is ultimately found to lack merit is not sufficient by itself to establish ... a bad faith claim." Id.

In support of their argument that plaintiff's UIM claim was fairly debatable, defendants rely heavily on the fact that they hired a causation expert because some courts

---

[58]Complaint at 7, ¶¶ 33, 35, attached to Notice of Removal, Docket No. 1.

[59]Id. at ¶ 34.

have found that an insurer's reliance on an expert is evidence that the claim in question is fairly debatable. See, e.g., Lakehurst Condominium Owners Ass'n v. State Farm Fire and Cas. Co., 486 F. Supp. 2d 1205, 1214 (W.D. Wash. 2007) ("There is no question that the investigations performed by American and Trinity were reasonable. Both insurers hired qualified experts, and the experts conducted extensive inspections of the subject property."); Maynard v. State Farm Mut. Auto. Ins. Co., 499 F. Supp. 2d 1154, 1160 (C.D. Cal. 2007) ("An insurer may also demonstrate a genuine dispute if it relied on opinions from experts while evaluating the insured's claim"); Prince v. Bear River Mut. Ins. Co., 56 P.3d 524, 535 (Utah 2002) ("[d]enying benefits under an insurance policy in reliance on an expert's report ... is not a bad faith denial because the expert's report creates a legitimate factual question regarding the validity of an insured's claim for benefits, making the insured's claim at least fairly debatable").

But even if plaintiff's UIM claim was fairly debatable, it is still possible that defendants acted in bad fath. "[I]n defending a fairly debatable claim, an insurer must exercise reasonable care and good faith." Zilisch v. State Farm Mutual Auto. Ins. Co., 995 P.2d 276, 279 (Ariz. 2000). "[I]f an insurer acts unreasonably in the manner in which it processes a claim, it [can] be held liable for bad faith...." Id. at 280.

Defendants argue that there is no evidence that they acted unreasonably in handling plaintiff's UIM claim. Defendants argue that the evidence shows that as soon as State Farm was notified of the accident, it contacted plaintiff, through his counsel, to obtain an overview

of the facts. Defendants also point out that they promptly gave consent for plaintiff to settle his liability claim. Defendants further contend that once it became clear that plaintiff had an UIM claim, they began investigating the claim by gathering information about the damage to plaintiff's vehicle and obtaining his medical records. Defendants contend that this information gave rise to additional questions about causation, which defendants continued to investigate. Defendants point out that this is when they hired Hayes and also decided to conduct an examination under oath (EUO). As more of plaintiff's pre-accident medical history came to light, defendants continued to investigate to determine whether the accident was the cause of his neck injury. Defendants argue that this was reasonable, especially since they had Hayes' report in which Hayes opined that the accident did not cause plaintiff's injuries. Defendants also argue that their decision to conduct an EUO was reasonable because plaintiff had provided inaccurate and misleading information about his pre-accident medical history. Defendants argue that an EUO was an appropriate way to resolve the questions that had arisen about plaintiff's medical history, given that the policy provides that State Farm may obtain an EUO.[60]

Plaintiff, however, has come forward with sufficient evidence to raise genuine questions of material fact as to whether defendants' handling of his UIM claim was reasonable. In large part this evidence is in the form of testimony from plaintiff's expert,

---

[60]Exhibit D at 5, Defendants' Motion for Summary Judgment, Docket No. 151.

Stephen Strzelec.[61]  Strzelec testified that he looks at what the industry standards are for an insurer and whether in a particular case, an insurer complied with those standards.[62]  Based on those standards, Strzelec testified that defendants' "investigation wasn't timely.  It clearly was done with a predisposition towards denial, which is never appropriate."[63]  Strzelec testified that Yount had already decided that plaintiff had been adequately compensated before Yount even began his investigation and that Yount raised issues that were factually incorrect, such as there was no way plaintiff could have hit his head when he was rear-ended.[64]  Strzelec testified that he did not "see, based on the information [that Yount had] at the time he completed the evaluation that he could ... in good faith ... continue[] to offer zero.  But he was locked in with his predisposition and his bias[.]"[65]  Strzelec testified that Yount considered information "in the worst possible light for the insured" and that rather than investigating, he relied on his assumptions and was unwilling to change his opinion about

---

[61]Strzelec is a former insurance adjuster for State Farm and now runs a consulting business.  Exhibit 4, Opposition to Motion for Summary Judgment, Docket No. 157.

[62]Deposition of Stephen Strzelec at 27:13-16, Exhibit 1, Opposition to Motion for Summary Judgment, Docket No. 157.

[63]Id. at 81:18-20.

[64]Id. at 89:4-16.

[65]Id. at 119:3-8.

plaintiff's claim no matter what facts were discovered.[66]  Strzelec's testimony is sufficient

to defeat defendants' motion for summary judgment on plaintiff's bad faith claims.

Turning then to defendants' alternative motion for partial summary judgment,

defendants first argue that they are entitled to summary judgment on plaintiff's request for

punitive damages.  Under Alaska law, punitive damages are only available "if the plaintiff

proves by clear and convincing evidence that the defendant's conduct (1) was outrageous,

including acts done with malice or bad motives; or (2) evidenced reckless indifference to the

interest of another person."  AS 09.17.020.  "Malice may be inferred if the acts exhibit 'a

callous disregard for the rights of others.'"  Weiford, 831 P.2d at 1266 (quoting Alyeska

Pipeline Serv. Co. v. O'Kelley, 645 P.2d 767, 774 (Alaska 1982)).  Reckless indifference

means unreasonably disregarding a known risk of substantial harm to another.  Jones v.

Bowie Industries, Inc., 282 P.3d 316, 339 (Alaska 2012).  "However, 'where there is no

evidence that gives rise to an inference of actual malice or conduct sufficiently outrageous

to be deemed equivalent to actual malice,' the trial court need not, and indeed should not,

submit the issue of punitive damages to the jury.'"  Weiford, 831 P.2d at 1266 (quoting

Alyeska Pipeline Serv. Co., 645 P.2d at 774).

As the Alaska Supreme Court has explained,

> [n]ot all conduct which amounts to the tort of bad faith is
> sufficiently outrageous to warrant an award of punitive dam-
> ages.  That was the case in Nicholson where the insured made

---

[66]Id. at 89:23-90:4.

a claim under his homeowner's policy for damages caused when a water main broke. Although State Farm agreed to cover a related claim asserted by a neighbor, it denied coverage of the insured's claim. Three months later State Farm agreed that there was coverage, but waited another year and a half before making a formal offer of settlement. The insured's expert witness testified that State Farm's delay was both unreasonable and outrageous. We concluded based on our review of the entire record that there was insufficient evidence as a matter of law to support a finding of outrageous conduct or a gross deviation from an acceptable standard of reasonable conduct in order to sustain an award of punitive damages.

Id. at 1266–67 (internal citations omitted).

In Weiford, the plaintiff's "primary argument in support of her punitive damages award [was] centered on the fact that in 1984 and 1985 State Farm decided to take a 'tough stance' on payments to insureds." Id. at 1267. Weiford argued that this "tough stance" had led to State Farm offering to settle her claim for unreasonably low amounts. Id. As other evidence in support of her request for punitive damages, Weiford cited to a "State Farm supervisor's note in the claim file not to offer more money than $20,000 because 'with policy limits of $25 K, insured has more to lose by going to arbitration than we do.'" Id. And, Weiford contended that State Farm had taken positions in arbitration that it knew were false. Id. The Alaska Supreme Court found that while this evidence "would justify a finding that State Farm was acting in bad faith, none of the evidence shows conduct which may fairly be categorized as outrageous." Id.

Plaintiff argues that a reasonable jury could find that defendants had acted with reckless disregard for his interests. Plaintiff cites to Government Employees Insurance

Company v. Gonzalez, 403 P.3d 1153 (Alaska 2017), in support of his argument.  There, Gonzalez alleged that GEICO had acted in bad faith because it had failed to timely investigate and pay her UIM claim.  Id. at 1157.  Although GEICO eventually paid Gonzalez's UIM claim, it took four years to do so.  Id.  During those four years, GEICO repeatedly refused to investigate Gonzalez's UIM claim.  Id.  Based on those facts, a jury awarded Gonzalez $2 in nominal damages and $450,000 in punitive damages on her bad faith claim.  Id.

Gonzalez does not help plaintiff.  This case is not at all similar to Gonzalez.  There, over a four-year period, the insurance company repeatedly refused to investigate the insured's claim.  Here, although Strzelec testified that there was some delay in investigating plaintiff's UIM claim, there was not a four-year delay.  While there may be evidence in this case that would justify a finding that defendants acted in bad faith, no reasonable jury could find that defendants acted outrageously or in reckless disregard for plaintiff's interests.  Defendants are entitled to summary judgment on plaintiff's request for punitive damages.

Next, defendants move for summary judgment on two portions of plaintiff's emotional distress damages.  In his answers to defendants' interrogatories, plaintiff stated that he

> suffered from emotional distress, anxiety[,] the stress of hiring counsel, attorney costs, expert fees, the stress of a deposition, and the immense stress that comes with sitting through a week-long trial and lost income because of time spent in litigation. All of this was going on while [p]laintiff's wife's medical

condition worsened and [she] eventually pass[ed] away before seeing a resolution in this case.[67]

Plaintiff also stated that

> [d]ue to his injury, he was forced into a lesser paying position and [had to] leave the field he grew up working in and loves. Having less income caused stress as to how [p]laintiff could care for his family. Plaintiff also suffered additional anxiety over how he would be financially affected by the injury as a result of State Farm's denial and litigation. Plaintiff suffered from headaches, stomach aches and nausea and still suffers d[ue] to the ongoing litigation.[68]

Defendants argue that plaintiff cannot recover damages for any emotional distress caused by the accident itself because he has already been compensated for any damages caused by the accident. To the extent that plaintiff is seeking emotional distress damages related to the accident as part of his bad faith claim damages, plaintiff is precluded from doing so.

Next, defendants argue that damages for stress related to the litigation process are not recoverable. The Alaska Supreme Court has never addressed this issue. "'When the state's highest court has not squarely addressed an issue,'" this court "must 'predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treaties and restatements for guidance.'" First Interconti-

---

[67]Plaintiff Abraham Allen's Responses to Defendants' Interrogatories, Exhibit H at 2, Defendants' Motion for Summary Judgment, Docket No. 151.

[68]Id. at 3.

nental Bank v. Ahn, 798 F.3d 1149, 1157 (9th Cir. 2015) (quoting Glendale Assocs., Ltd. v. Nat'l Labor Relations Bd., 347 F.3d 1145, 1154 (9th Cir. 2003)).

This court predicts that the Alaska Supreme Court would hold that litigation-induced stress is not recoverable, primarily because "the heavy weight of authority holds that litigation-induced stress is not ordinarily recoverable as an element of damages." Zimmerman v. Direct Federal Credit Union, 262 F.3d 70, 79 (1st Cir. 2001); see also, Picogna v. Board of Educ. of Tp. of Cherry Hill, 671 A.2d 1035, 1038 (N.J. 1996) ("the majority of courts addressing litigation-induced stress have treated it as a non-compensable component of damages regardless of whose actions necessitate the litigation"). As the Picogna court explained,

> [a]lthough the damages caused by the wrongful conduct induce the litigation, and hence the attendant stress, a plaintiff chooses to pursue litigation cognizant of both the economic and emotional costs that it will entail. Some of the stress is caused by a general distaste for litigation, and some by a plaintiff's vigorous participation in the litigation process. Yet the substantial emotional investment made by a plaintiff in a case is merely the normal result of being a litigant.

Id. at 1039.

The court is mindful that plaintiff contends that he should be able to recover damages for litigation-induced stress because State Farm eliminated arbitration from its Alaska policies and requires an UIM claimant to file a lawsuit if his UIM claim is disputed. But, there is no requirement that State Farm provide for arbitration of UIM claims. State Farm's decision to eliminate arbitration from its Alaska policies does not mean that plaintiff should

be able to recover litigation-induced stress as part of his bad faith damages. Should he prevail on his bad faith claims, he may be able to recover damages for the emotional distress related to the delay in payment of his UIM claim. Ennen v. Integon Indemnity Corporation, 268 P.3d 277, 291 (Alaska 2012). But, he may not recover emotional distress damages caused by the litigation itself.

Finally, defendants argue that plaintiff cannot recover as bad faith damages the attorney's fees he incurred in pursuing his UIM claim. Plaintiff disagrees and argues that the attorney's fees and costs that he incurred in pursuing his UIM claim should be recoverable as damages if he prevails on his bad faith claims because if they are not, then claimants would have little incentive to challenge denials of UIM claims.

Plaintiff's argument is precluded by Alaska Pacific Assurance Company v. Collins, 794 P.2d 936 (Alaska 1990). There, "Collins argue[d] that an award of full attorney's fees is appropriate as a measure of tort damages where an insurance company denies coverage in bad faith." Id. at 949. The court rejected this argument and held that any attorney's fees should be governed by Rule 82. Id. Any award of attorney's fees in this case will be taken up once the case is completely resolved and will be governed by Rule 82. Similarly, any award of litigation costs will be taken up once this case is completely resolved.

### Conclusion

Defendants' motion for summary judgment on plaintiff's bad faith claims is denied. Defendants' alternative motion for partial summary judgment is granted. Plaintiff may not

seek punitive damages on his bad faith claims. He also may not seek to recover, as part of his bad faith damages, damages based on emotional distress related to the underlying accident, litigation-induced emotional distress, and his attorney's fees and costs incurred in litigating his UIM claim.

DATED at Anchorage, Alaska, this 26th day of March, 2018.

/s/ H. Russel Holland
United States District Judge